# Exhibit A

ELECTRONICALLY
FILED
10/11/2012
K. TORRE, CLERK OF THE COURT
SUPERIOR COURT OF CALIFORNIA
COUNTY OF CONTRA COSTA - MARTINEZ
BY: S. PASSOT, DEPUTY CLERK

1 | John R. Till   SBN 178763   JTill@PaladinLaw.com
2 | Bret A. Stone   SBN 190161   BStone@PaladinLaw.com
    PALADIN LAW GROUP® LLP
3 | 1176 Boulevard Way
    Walnut Creek, California 94595
4 | Telephone: (925) 947-5700
    Facsimile: (925) 935-8488

5 | Counsel for Plaintiffs
6 | Ryan, Anne and Reese Schaeffer

7 | **SUPERIOR COURT OF CALIFORNIA**

    **COUNTY OF CONTRA COSTA**

8 |

9 | RYAN SCHAEFFER, an individual; ANNE | Case No. MSC11-01307
    SCHAEFFER, an individual; and REESE
10 | SCHAEFFER, a minor by and through her | FOURTH AMENDED COMPLAINT FOR:
    general guardians Ryan Schaeffer and Anne
11 | Schaeffer, | 1. Abatement of an Imminent and Substantial
                      Plaintiffs, |    Endangerment
12 | vs. | 2. Abatement of a Public Nuisance
             | 3. Abatement of a Private Nuisance
13 | GREGORY VILLAGE PARTNERS, L.P., a | 4. Continuing Trespass
    California partnership; CENTRAL CONTRA | 5. Negligence
14 | COSTA SANITARY DISTRICT, a California | 6. Negligence *Per Se*
    special district; M.B. ENTERPRISES, INC., a | 7. Intentional Infliction of Emotional Distress
15 | California corporation; MASSOUD EBRAHIMI, | 8. Ultrahazardous Activity
    an individual dba Pleasant Hill Chevron; | 9. Declaratory Relief
16 | JIEWON LIM, an individual dba P & K Gregory | 10. Waste
    Cleaners; MOON S. LIM, an individual dba | 11. Cost Recovery under HSAA
17 | P&KS Gregory Cleaners; FLOYD G. TAYLOR, , | 12. Dangerous Condition of Public Property
    an individual; JAY BREAR aka Major Brar, an | 13. Fraudulent Misrepresentation
18 | individual and dba Park Avenue Cleaners; PARK | 14. Fraudulent Concealment
    AVENUE CLEANERS, INC., a California | 15. Negligent Misrepresentation
19 | corporation; VPI, INC., aka, fka, dba, and/or as | 16. Business & Professions Code § 17200
    general partner of Village Properties, L.P, Village
20 | Builders, L.P., and Gregory Village Partners, | DEMAND FOR JURY TRIAL
    L.P.; CHEVRON USA, INC., a California
21 | corporation; ESTATE OF SAM S. LIM,
    DECEASED; BHAGDEEP S. DHALIW, an
22 | individual and dba Pleasant Hill Chevron;
    DAVID WOO, an individual and dba P&KS
23 | Gregory Cleaners; JOSEPH J. LEE, an individual
    and dba P & K Gregory Cleaners; ESTATE OF
24 | KATHLEEN N. TAYLOR, DECEASED; ALAN
    CHEI, an individual and dba P&KS Gregory
25 | Cleaners; THE KENLOW CORPORATION, a
    California corporation; KENNETH P. LOWRY,
26 | an individual; PICCOLO PROPERTIES, a
    California limited partnership; and DOES 1
27 | through 200,

28 |                    Defendants.

1    Plaintiffs Ryan Schaeffer, Anne Schaeffer, and their daughter Reese Schaeffer ("Plaintiffs") for

2    their Fourth Amended Complaint against GREGORY VILLAGE PARTNERS, L.P., a California

3    partnership; CENTRAL CONTRA COSTA SANITARY DISTRICT, a California special district; M.B.

4    ENTERPRISES, INC., a California corporation; MASSOUD EBRAHIMI, an individual dba Pleasant

5    Hill Chevron; JIEWON LIM, an individual dba P & K Gregory Cleaners; MOON S. LIM, an individual

6    dba P&KS Gregory Cleaners; FLOYD G. TAYLOR, an individual; JAY BREAR aka Major Brar, an

7    individual and dba Park Avenue Cleaners; PARK AVENUE CLEANERS, INC., a California

8    corporation; VPI, INC., aka, fka, dba, and/or as general partner of Village Properties, L.P., Village

9    Builders, L.P., and Gregory Village Partners, L.P.; CHEVRON USA, INC., a California corporation;

10    ESTATE OF SAM S. LIM, DECEASED; BHAGDEEP S. DHALIW, an individual and dba Pleasant

11    Hill Chevron; DAVID WOO, an individual and dba P&KS Gregory Cleaners; JOSEPH J. LEE, an

12    individual and dba P & K Gregory Cleaners; ESTATE OF KATHLEEN N. TAYLOR, DECEASED;

13    ALAN CHEI, an individual and dba P&KS Gregory Cleaners; THE KENLOW CORPORATION, a

14    California corporation; KENNETH P. LOWRY, an individual; PICCOLO PROPERTIES LP, a

15    California limited partnership (incorrectly named as Cardoza Properties, Inc., a California corporation);

16    and DOES 1 through 200, as well as their respective employees, managers, investors, directors,

17    partners, owners, agents, tenants, predecessors in interest, successors in interest, and representatives

18    (collectively, "Defendants") allege upon knowledge as to their own acts, and upon information and

19    belief as to the acts of all others, as follows:

20                             **NATURE OF THE ACTION**

21    1.    Plaintiffs are a young family whose health, safety, and the value, use and enjoyment of their

22    house and property are being impacted by toxic contamination flowing under and into their home. This

23    action is designed to address and resolve the continuing environmental problem created by Defendants'

24    acts or omissions which caused and continue to cause damage to the health, safety, and property of

25    Plaintiffs and their neighbors and to the environment.

26    2.    The area of contamination for which Plaintiffs seek relief is approximately located within the

27    1600-1700 blocks of Contra Costa Boulevard and spreads into Plaintiffs' neighborhood to the west,

28    north-northwest, and north in Pleasant Hill, California and in each and every location where

1  contamination is currently located, is emanating to or from, or threatens to become located, within the

2  environment, including buildings, soil, air, vapor, groundwater, and surface water (the "Site").

3      3.    Sampling performed at the Site, including at and near Plaintiffs' home and the Gregory

4  Village Property, demonstrated elevated levels of numerous contaminants from dry cleaning, silver

5  plating, gun shop, and furniture stripping operations. Because Plaintiffs' property and their mental and

6  physical health are or may be threatened by this contamination caused during Defendants' past handling

7  of solid wastes, hazardous substances, or hazardous wastes on the Property, Plaintiffs seek an injunction

8  requiring Defendants to perform a prompt, comprehensive, and effective environmental investigation

9  and remediation of the contamination. Moreover, as part of the injunction, Plaintiffs seek to be

10  relocated at Defendants' expense until such contamination is fully remediated.

11                              **PARTIES**

12                              *Plaintiffs*

13      4.    Plaintiffs are innocent property owners who moved into their home located at 95 Cynthia

14  Drive, Pleasant Hill, California ("Plaintiffs' Home") on or about June 1, 2006.

15      5.    Ryan Schaeffer and Anne Schaeffer are husband and wife. Reese Schaeffer is the daughter

16  of Ryan and Anne Schaeffer and was born in the house on May 31, 2010.

17      6.    Plaintiffs' Home is the primary residence of Plaintiffs.

18                              *Defendants*

19      7.    Defendant Gregory Village Partners, L.P. is the successor in interest to and/or assignee of The

20  Kenlow Corporation, the successor in interest to and/or assignee of Village Builders 98, L.P., and the

21  current owner of a shopping center located at 1601-1699 Contra Costa Boulevard, 74 Doris Drive, and

22  69 and 75 Doray Drive, Pleasant Hill, California (the "Gregory Village Property"). VPI, Inc. is the

23  general partner of Gregory Village Property Partners, L.P. and is also the general partner for Village

24  Builders, L.P., a California limited partnership, which owned 40% of the property from approximately

25  February 20, 1998 until it transferred and assigned its interest to Gregory Village Partners, L.P. on

26  approximately March 25, 2004 (collectively, "Gregory Village Partners"). VPI, Inc. is the general

27  partner of Village Builders, L.P., Village Builders 98, L.P., and Gregory Village Partners, L.P. Each

28  of the defendants, and their owners, shareholders, affiliates, partners, officers, directors and managers,

1    that constitute Gregory Village Partners or other associated persons or entities are alter egos of the

2    others such that the ownership, operations, conduct and omissions of each one is attributed under the

3    law to the others.  It is also alleged based on information and belief that Gregory Village Partners and

4    the related entities are the mere continuation of prior entities, are successors in interest, or have merged

5    with various entities and by that merger (expressed, implied, or by *de facto* merger) have assumed those

6    liabilities.  Also, Gregory Village Partners, L.P. acquired the assets and liabilities of The Kenlow

7    Corporation because it assumed those liabilities and because it is a successor in interest to and/or

8    assignee of The Kenlow Corporation.  Village Builders, L.P. is the successor in interest to Mt.

9    Vernon/Bernard Partners, L.P., which in turn is also a successor in interest to The Kenlow Corporation.

10    As such, Village Builders, L.P. and Mt. Vernon/Bernard Partners, L.P. (collectively, "Gregory Village

11    Partners") are also responsible for The Kenlow Corporation's liabilities.  Gregory Village Partners

12    asserts in documents it produced in this case that it is the successor in interest to, and assignee of, The

13    Kenlow Corporation.

14          8.    Defendants The Kenlow Corporation, a California corporation, and Kenneth Lowry

15    (collectively, "Kenlow") owned the Gregory Village Property prior to selling it to Gregory Village

16    Partners.  During Kenlow's ownership of the Gregory Village Property, Kenlow's tenants stored,

17    generated, handled, transported, released, and/or disposed of hazardous substances into the

18    environment.  Officers and directors associated with these defendants are believed to include, but not

19    be limited to, the following persons: The Kenlow Corporation (formerly The Patlow Corporation);

20    Kenneth B. Lowry, Director and President; Patrick Lowry, Director and Vice President; Jennifer Lowry

21    Barney, Director and Secretary; Jenny G. Lowry, aka Jennifer Lowry; Howard B. Lowry, Director, Vice

22    President; Don Michael Baucum, Registered Agent; Kiersten Lowry (wife of Patrick Lowry); Howard

23    B. Lowrie, President; and Howard Lowery, President.

24          9.    Defendants Estate of Sam Lim, Deceased, Jiewon Lim, Joseph J. Lee, Moon S. Lim (also

25    known as Tae Gue Lim), Alan Chei, David Woo, Floyd G. Taylor, Estate of Kathleen N. Taylor,

26    Deceased, Jay Brear aka Major Brar, and Park Avenue Cleaners, Inc. owned and/or operated the dry

27    cleaning facility at the Gregory Village Property known as P&K Cleaners (also known as P&K Gregory



28    Cleaners, P&KS Gregory Cleaners, and Park Avenue Cleaners).  P&K Cleaners operated an "active"

1    on-site dry cleaning operation at the Gregory Village Property at 1643 (also known as 1641) Contra

2    Costa Blvd. from approximately 1965 until at least 1991.  The dry cleaners continued to operate

3    thereafter at the Gregory Village Property at least as an off-site ("drop-off/pick-up" only) dry cleaners

4    and possibly as an on-site dry cleaning operation.  Dry cleaning equipment and PCE remained at the

5    premises for many years after the dry cleaners supposedly became a "drop-off/pick-up" only shop and

6    after Gregory Village Partners purchased the Gregory Village Property.  Accordingly, based on

7    documents produced by Gregory Village Partners, the dry cleaning equipment, PCE, and hazardous

8    wastes were stored, handled, generated, transported, released, and/or disposed of on-site during its

9    ownership, its predecessors in interest's ownership, and by Gregory Village Partners.  Moon Soo Lim

10   dba P&K Cleaners vacated the premises on or about September 20, 1999.  She abandoned and left

11   behind dry cleaning equipment and PCE pursuant to a stipulated judgment between Moon Lim and

12   Gregory Village Partners, L.P., and Village Builders, L.P., which was filed on August 31, 1999.

13   Gregory Village Partners, L.P., and Village Builders, L.P., took possession of and title to the equipment

14   and PCE on September 20, 1999.  In October of 1999, Gregory Village Partners hired ACC

15   Environmental Consultants to drain, dismantle, remove and dispose of the dry cleaning equipment

16   along with approximately 30 gallons of remaining PCE, which it had taken ownership of pursuant to

17   the Settlement Agreement. And based on documents produced by Gregory Village Partners, hazardous

18   waste was stored, handled, generated, released, and/or disposed of at the property during Gregory

19   Village Partners' ownership and operation of the Gregory Village Property and by Gregory Village

20   Partners.    In fact, Gregory Village Partners' environmental consultants, ACC Environmental

21   Consultants, stated that "suspect sources of impact to soil and groundwater were stopped, and the

22   known on-going sources of impact (machinery and contaminated soil)" were removed to the extent

23   feasible in 1999.

24        10.   Defendants Bhagdeep S. Dhaliw, Massoud Ebrahimi, M.B. Enterprises, Inc. (also known as

25   M B Enterprises, Inc.), Pleasant Hill Chevron, and Chevron USA, Inc. as the successor to Standard Oil

26   of California, owned and operated the service station at 1705-1709 Contra Costa Boulevard, Pleasant

27   Hill, California (the "Chevron Property").  An active dry cleaning operation was also located at the

28   Chevron Property from approximately 1956 until approximately 1986.



1    11.   Defendant Piccolo Properties LP is the current owner and operator of 1521-1529 Contra Costa

2    Blvd., formerly known as 50 Doray Drive, Pleasant Hill, California (the "Piccolo Property").   A

3    gasoline service station formerly operated on the Piccolo Property. The Schaeffers substitute Defendant

4    Piccolo Properties LP for Cardoza Properties, Inc., which they mistakenly named as this defendant, but

5    which they have since been informed is actually the property manager for Piccolo Properties LP.

6    12.   Bob Fromm, individually, and dba Armadillo Silver (aka Armadillo Silver Plating Works)

7    owned and operated from approximately 1976 until approximately 2002 an electroplating, laquer spray,

8    and metal repair facility at 1637 Contra Costa Blvd., Pleasant Hill, California. According to documents

9    produced by CCCSD, an inspection was conducted at this business on or about April of 2002 (during

10   Gregory Village Partners' ownership of the Gregory Village Property), which collected three samples

11   from the sink and lateral located within the unit operated at this facility.   According to the samples

12   taken, at least the following pollutants exceeded reporting limits: arsenic, barium, cadmium, chromium,

13   colbalt, copper, lead, mercury, nickel, selenium, silver, and zinc. According to a June 27, 1985 letter

14   from the City of Pleasant Hill to Kenlow Corporation and Kenneth Lowry in records produced by

15   Gregory Village Partners, Kenlow and Gregory Village Partners were aware that Armadillo Silver

16   operated since at least 1976 at 1637 Contra Costa Blvd. and that this business had numerous building

17   code violations and deficiencies pertaining to the electrical system and lacquer spraying at the property.

18   Further, according to this letter, there were acid spills on the concrete floor, which was severely

19   deteriorated.  In addition, this letter from 1985 calls into question whether the silver plating operation

20   is a suitable use for a shopping center based on the quantities of acid and the demand on electricity.

21   The letter further explains that the operations of electroplating and lacquer spraying are not permitted

22   within the Retail Business District and that these types of operations are only permitted in the General

23   Commercial and Limited Industrial Districts.   Additional inspections were conducted on or about

24   January 8, 1993 and February 1, 1995, which identified various violations including of California Code

25   of Regulations 66265.177, AB2185, treatment of hazardous waste on site without registering with the

26   state, and suggested that the local planning department should evaluate operation for compliance with

27   surrounding land uses. Records from the Contra Costa County Health Services Department include a

28   1997 Business Plan which described the materials stored and used on site at the Armadillo Silver

1   Plating Company as follows: hydrochloric acid, nickel sulphate, potassium cyanide, metal silicates and

2   sulfuric acid.   When observed in 1997, the site included the following above-ground storage tanks

3   (ASTs) ranging in size from 30 to 75 gallons: three ASTS containing 15% cyanide solution, two ASTs

4   containing 8% cyanide solution, one AST containing 15% sulfric acid, one AST containing 12% sulfric

5   acid and one AST containing caustic potash at 25%.   During the inspection in 1997, poor housekeeping,

6   no secondary containment beneath the ASTs, and irritating vapors were observed.   Based on

7   information and belief, in the course of Armadillo Silver's operations, it is alleged that Armadillo Silver

8   released hazardous substances into the environment at the Gregory Village Property during Gregory

9   Village Partners' ownership of that property.   According to a February 22, 2002 request for prosecution

10   from Contra Costa County Health Services Department, around 600 gallons of hazardous wastes were

11   unaccounted for when Armadillo Silver moved its operation from the Gregory Village Property to

12   Martinez on or about September 30, 2001.   There does not appear to have been any investigation to

13   determine the nature and extent of any potential impact to the environment from these operations.

14         13.   Valley Gun was also a tenant of Gregory Village Partners at the Gregory Village Shopping

15   Center. It was located at 69 Doray Drive.   Plaintiffs have thus far been unable to find despite diligent

16   effort any evidence that Valley Gun properly disposed of its hazardous waste.   Based on information

17   and belief, it is alleged that Valley Gun disposed of its solvents and other hazardous substances by

18   dumping them down the drain at its premises or otherwise, that those substances have entered the

19   environment through cracks and open joints in the drain and sewer pipes, and that this has occurred

20   during Gregory Village Partners' ownership of the Gregory Village Property.   It is also alleged that

21   Valley Gun handled, stored, used, generated, released, and/or disposed of hazardous wastes at the

22   Gregory Village Property during Gregory Village Partners' ownership of such property. There does not

23   appear to have been any investigation to determine the nature and extent of any potential impact to the

24   environment from these operations.

25         14.   During a property inspection, environmental consultants have also indicated that various

26   (unidentified) tenants also use, handle, generate, and store various (unidentified) hazardous substances

27   on a daily basis at the Gregory Village Property. (The consultants did not identify the tenants or the



28   substances.)

15. Houck's Furniture Stripping was also a tenant at the Gregory Village Property from approximately 1978 to 1980 when the owner died due to methylene chloride poisoning during his operations at the property within suite 1631. Four above-ground storage tanks (ASTs) installed in the suite contained the following: 240 gallons of muriatic acid (31%), 800-gallons of pain removing liquid which included methylene chloride and methanol, an 800-gallon mixture of water with 150 pounds of sodium hydroxide (caustic soda), and a 35-gallon tank of phosphoric acid used for rust removal. The ASTs were located in an area that is now occupied by Burger Road. There does not appear to have been any investigation to determine the nature and extent of any potential impact to the environment from these operations.

16. Defendant Central Contra Costa Sanitary District ("CCCSD") is a special district that conveys wastewater, including wastewater from the Gregory Village Property, the Piccolo Property, and the Chevron Property and controls, maintains, repairs, and is in possession of the easements and utility trenches within and upon which its sewer system and storm water runs within the Site. CCCSD charges fees and received revenues from its current and historical acceptance and transporting of waste— including, but not limited to, wastes such as benzene, toluene, ethylbenzene, xylene, petroleum hydrocarbons, oil, lead, mercury, cyanide, chlorpyrifos, diazion, dieldrin, dioxin, perchloroethylene and its breakdown products—into its sanitary sewer system from commercial facilities, including the facilities of the Defendants in this matter. CCCSD also had the power, authority and duty to inspect the facilities which were discharging to their sewer system and in fact in later years conducted review of business plans of these facilities before allowing them to start operations and begin discharging to the system. Plaintiffs submitted a timely administrative claim to CCCSD that provided CCCSD with fair and sufficient notice of their causes of action against CCCSD set forth herein, but never received a written response.

17. Furthermore, Gregory Village Partners' use, handling, storage, generation, treatment, disposal, and/or releases of hazardous wastes is shown by their Second Amended Complaint, filed April 11, 2012, in the federal case *Gregory Village Partners, L.P. v. Chevron U.S.A., Inc., et al.,* Case No. 3:11-cv-01597-PJH (U.S. Dist. Ct. N. D. Cal.), which admits that CCCSD "charged property owners, including Gregory Village, a fee to dispose of their waste, including Hazardous Waste, into the sewer."



1    18.  Pursuant to California Code of Civil Procedure section 377.40 to the extent of the estates'

2    assets or their respective successors in interest and pursuant to California Probate Code sections 550

3    through 555, this complaint, or as amended in the future, is brought to establish the decedents' liability,

4    respectively, for which the estate defendants, collectively or individually, were protected by liability

5    insurance policies or to the extent any of the estates identified herein have any undistributed assets.

6    19.  Plaintiffs are informed and believe and thereupon allege that at all times herein mentioned

7    each of the Defendants were the agent, representative, tenants, landowners, successor, predecessor,

8    owners, director, officers, partners, or employees of each of the other Defendants, and that at all times

9    herein mentioned each of the Defendants was acting within the course and scope of their respective

10   relationships.

11   20.  Plaintiffs are informed and believe and thereupon alleged that at all times herein mentioned

12   each of the Defendants, and their owners, shareholders, affiliates, partners, officers, directors, and

13   managers, that constitute the ownership, management, control, authority, or other associated persons

14   or entities which received any benefit from the Defendants are alter egos of the others such that the

15   ownership, operations, conduct and omissions of each one is attributed under the law to the others.

16   21.  The true names and capacities, whether individual, corporate, associate, or otherwise, of

17   defendants Does 1 through 200 are unknown to Plaintiff at this time, and Plaintiffs' claims are asserted

18   against such defendants using fictitious names, pursuant to Section 474 of the California Code of Civil

19   Procedure.  When the true names and capacities of said Doe defendants have been ascertained, Plaintiff

20   will amend this complaint accordingly.

21                          **JURISDICTION, VENUE, AND NOTICE**

22   22.  Venue is appropriate in the Superior Court of Contra Costa County Court pursuant to Section

23   392 of the California Code of Civil Procedure because the actual and threatened endangerment,

24   nuisance, trespass, injuries, exposures, and damages at issue have taken place and/or continue to take

25   place in Contra Costa County and because Defendants' removal to federal court was deficient.

26   23.  Plaintiffs provided 90-days' notice of the actual and threatened endangerment, injury and

27   damage alleged herein in their Notice of Endangerment to:  (a) the Administrator of the United States

28   Environmental Protection Agency; (b) the State of California; and (c) each of the Defendants (except



1    Piccolo Properties LP) on or about February 9, 2011. The Notice of Endangerment also provided the

2    Defendants with links to public information on the specific nature and extent of the contamination that

3    is the subject of this action.

4        24.   Plaintiffs waited at least ninety (90) days after sending the Notice of Endangerment to each

5    of the Defendants before filing this action.

6        25.   Plaintiffs have satisfied all jurisdictional prerequisites to filing this Complaint.

7                              **GENERAL ALLEGATIONS**

8        26.   Tetrachloroethylene ("PCE") is an industrial solvent that is used in dry cleaning processes.

9    Common synonyms for PCE include perc, perchlor, carbon bichloride, carbon dichloride, ethylene

10   tetrachloride, perchloroethylene, perclene, perk, 1,1,2,2-tetrachloroethylene, and tetrachloroethene.

11   PCE and TCE are chlorinated solvents.

12       27.   The dry cleaning businesses that formerly operated on both the Gregory Village Property and

13   the Chevron Property used PCE in their dry cleaning processes.

14       28.   Over time, under anaerobic conditions present in the groundwater, reductive dechlorination

15   of chlorinated solvents naturally occurs according to the following sequence:  PCE degrades to

16   trichloroethylene ("TCE"), which in turn degrades to 1,2 dichloroethene ("DCE"), which in turn

17   degrades to vinyl chloride, which finally degrades to ethene.

18       29.   PCE, TCE, DCE, and vinyl chloride are each a "hazardous substance" as that term is defined

19   in federal law, 42 U.S.C. § 9601(14), and state law, Cal. Health & Safety Code § 25281(g).

20       30.   PCE, TCE, DCE, and vinyl chloride are each a "solid waste" and "hazardous waste" as those

21   terms are defined in federal law, 42 U.S.C. § 6903(5), (27).

22       31.   All groundwater within the State of California, including the groundwater in, at, around, and

23   in the vicinity of the Site and all groundwater that has been, and that may be, adversely impacted by

24   contamination at and emanating from and within the Site is "water of the state" pursuant to California

25   Water Code § 13050(e).

26       32.   Environmental data collected to date show elevated levels of PCE, TCE, DCE, and vinyl

27   chloride and other hazardous wastes are present at, near and/or emanating from the Gregory Village

28   Property, the Chevron Property, and the CCCSD facilities into the environment and into and at



1  Plaintiffs' Home.  These hazardous wastes at and migrating within the Site are from Defendants'

2  commercial properties and/or business operations within or in the vicinity of the Site.

3      33.  Soil vapor sampling results show PCE concentrations over 100 times California Human

4  Health Screening Levels at the Gregory Village Property.

5      34.  Plaintiffs first learned that the indoor air in Plaintiffs' Home was contaminated with hazardous

6  wastes when Gregory Village Partners provided testing results showing elevated levels of indoor air

7  contaminants in approximately September 2010.  Prior to that time, Plaintiffs had no reason to suspect

8  that hazardous wastes had contaminated the indoor air in their home.  However, even months later,

9  Gregory Village Partners assured Plaintiffs that there was nothing to be concerned about.

10     35.  In April 2011, Plaintiffs' learned from their own environmental consultant's indoor air

11  sampling investigation at Plaintiffs' Home that PCE was present in the indoor air at 24 to 27 times

12  greater than the regulatory guidance concentrations for residential indoor air.

13     36.  Defendants negligently, suddenly, or accidentally caused or contributed to the presence of

14  PCE, TCE, DCE, vinyl chloride, and other hazardous wastes in the environment in, at, and around the

15  Site, including the waters of the State of California, because each Defendant released or otherwise

16  discarded PCE, other chemicals, or hazardous wastes, or controlled the property from which PCE, other

17  chemicals, or hazardous wastes, were released or otherwise discarded, but failed to prevent or abate

18  contamination at Plaintiffs' Home, in the environment, and/or at the Site.

19     37.  Gregory Village Partners is the current owner of the Gregory Village Property where PCE and

20  other hazardous wastes were used, stored, generated, handled, transported, disposed of, and/or released

21  into the environment from dry cleaning operations, silver plating operations, furniture stripping, and

22  gun shop operations as well as from other tenants.  Gregory Village Partners is also responsible for

23  maintaining the common areas at the Gregory Village Property, and it charges its tenants for the cost

24  of such maintenance.  Gregory Village Partners has also done regrading and resurfacing work, as well

25  as foundation and earthquake retrofitting work at the Gregory Village Property.  Based on information

26  and belief, it is alleged that this work may have discharged, disturbed, exacerbated, and/or spread the

27  contamination in the environment. On information and belief, pursuant to an indemnity agreement

28  Gregory Village Partners also stands in the shoes of Kenlow, which owned the Gregory Village

1   Property at the time PCE and other hazardous wastes were released into the environment from the dry

2   cleaning tenants.  On information and belief, it is alleged that Gregory Village Partners knew of the

3   contamination at the Gregory Village Property from the dry cleaning operations as well as the

4   Armadillo Silver Plating and Houck's Furniture Stripping operations (and potentially the operations

5   of other businesses) before it purchased the property and business, and that it purchased the property

6   at a discounted price based on the contamination.

7       38.   Estate of Sam Lim, Deceased, Jiewon Lim, Joseph J. Lee, Moon S. Lim, Alan Chei, Grace

8   M. Lee, David Woo, Floyd G. Taylor, Estate of Kathleen N. Taylor, Deceased, Jay Brear aka Major

9   Brar, and Park Avenue Cleaners, Inc. owned and/or operated the dry cleaning facility at the Gregory

10   Village Property at the time PCE and other hazardous wastes were released into the environment.

11       39.   Bhagdeep S. Dhaliw, Massoud Ebrahimi, M.B. Enterprises, Inc., Pleasant Hill Chevron, and

12   Chevron USA, Inc., owned or controlled the Chevron Property at the time PCE and other hazardous

13   wastes were handled, generated, transported, disposed of, used, stored, and/or released into the

14   environment from the dry cleaning tenants and the service station operations.  Each of these defendants,

15   and their owners, partners, officers, directors and managers, are alter egos of the others such that the

16   ownership, operations, conduct and omissions of each one is attributed under the law to the others.

17       40.   On information and belief, Piccolo Properties LP owned and controlled the Piccolo Property

18   at the time PCE and other hazardous wastes were handled, generated, transported, disposed of, used,

19   stored, and/or released into the environment from the dry cleaning tenants and the service station

20   operations.

21       41.   Gregory Village Partners and Kenlow, as lessors of the Gregory Village Property, had a

22   measure of control over the decisions regarding the types of businesses they leased to and whether to

23   permit the use, generation, transportation, disposal, storage, and/or handling of hazardous waste by their

24   tenants.

25       42.   Gregory Village Partners and Kenlow, as lessors of the Gregory Village Property, were aware

26   that their dry cleaning tenants and other tenants had used, handled, generated, stored, transported,

27   disposed of, and/or released and were continuing to use, handle, generate, store, transport, dispose of,

28   and/or release hazardous wastes into the environment at the Gregory Village Property.

43.   According to a June 27, 1985 letter from the City of Pleasant Hill to Kenlow Corporation and Kenneth Lowry in records produced by Gregory Village Partners, Kenlow and Gregory Village Partners were aware that Armadillo Silver operated since at least 1976 at 1637 Contra Costa Blvd., Pleasant Hill, CA and had numerous building code violations and deficiencies pertaining to the electrical system and lacquer spraying at the property.  Further, according to this letter there were acid spills on the concrete floor, which was severely deteriorated.  In addition, this letter from 1985 calls into question whether the silver plating operation is a suitable use for a shopping center based on the quantities of acid and the demand on electricity.  The letter further explains that the operations of electroplating and lacquer spraying are not permitted within the Retail Business District and that these types of operations are only permitted in the General Commercial and Limited Industrial Districts.

44.   Gregory Village Partners and Kenlow, as lessors of the Gregory Village Property, were in a position to and had the power, authority and duty to control their tenants, prevent their tenants from using, generating, storing, handling, transporting, disposing of, and/or releasing hazardous wastes into the environment at the Site, and, having failed that, to at least abate or prevent the spread of the resulting contamination, which presents or may present a threat to human health or the environment.

45.   Prior to and at the time of its purchase of the Gregory Village Property from Kenlow, Gregory Village Partners was aware of the contamination at the Site, the prior releases at the Site, and the fact that the contamination would continue to spread in the sub-surface at the Site causing more damage or increasing the threat to human health or the environment and therefore is not an innocent owner of the Gregory Village Property.

46.   Chevron and M.B. Enterprises, Inc., as owners and operators of the Chevron Property, owners and operators of businesses that operated on the Chevron Property, and lessors and sub-lessors of the Chevron Property, had a measure of control over the decisions regarding the types of businesses they leased and sub-let to and whether to permit the use, storage, and handling of hazardous waste by their tenants and sub-tenants.

47.   Chevron and M.B. Enterprises, Inc., as lessors and/or sub-lessors of the Chevron Property, were aware that their tenants or their own actions had used, generated, handled, transported, disposed of, and/or released hazardous wastes and were continuing to use, generate, handle, transport, dispose



1  of, and/or release hazardous wastes into the environment at the Chevron Property.

2      48.  Chevron and M.B. Enterprises, Inc. were in a position to and had the power, authority and duty

3  to control their service station tenants, prevent their tenants from releasing hazardous wastes into the

4  environment at the Site, and, having failed that, to at least abate or prevent the spread of the resulting

5  contamination.

6      49.  Prior to and at the time of their purchase of the Chevron Property, Chevron and M.B.

7  Enterprises, Inc. were aware of the contamination at the Site, the prior releases at the Site, and the fact

8  that the contamination would continue to spread in the sub-surface at the Site causing more damage and

9  increasing the threat to human health and the environment.

10      50.  On information and belief, all landlord Defendants received the benefit of rent payments from

11  their tenants on their respective properties.

12      51.  CCCSD owned, operated, possessed, controlled, and permitted the use of the sanitary sewer

13  lines and its related easements associated with the Gregory Village Property, the Chevron Property, the

14  Piccolo Property and Plaintiffs' Home.

15      52.  CCCSD's sanitary sewer lines transported contamination from the dry cleaning and service

16  station facilities at the Chevron Property and the Gregory Village Property to Plaintiffs' Home. The

17  sewer lines leaked in a number of locations (joints, low spots/sags, root penetrations, etc.) causing

18  hazardous wastes to spread to Plaintiffs' Home.

19      53.  Between 2005 and 2008, CCCSD performed a closed circuit television inspection of the sewer

20  line between Chevron Property, the Gregory Village Property, and the area around Plaintiffs' Home.

21  The inspection showed the sewer line had sags, root penetrations, and at least one separated joint. A

22  key part of the sewer line in the area around Plaintiffs' Home, near where the sewer pipe construction

23  material changed (clay to cast iron), was never inspected. Each of these forgoing features of the sewer

24  line is a location where the sewer leaked. Leaks will continue to occur at these features. CCCSD knew

25  that dry cleaners and service stations/auto repair shops were using the sewers to discharge hazardous

26  wastes and failed to use due care to ensure that the hazardous wastes were not released to the

27  environment. Furthermore, CCCSD failed to take precautions to prevent the release of hazardous



28  wastes from its sewer that originated at dry cleaners and service stations/auto repair shops.

54.   CCCSD, as the owner and operator of the sanitary sewer, had a measure of control over the decisions regarding hazardous wastes discharged into the sanitary sewer, enforcement against businesses that discharged hazardous wastes, as well as repair and maintenance of leaks in the sanitary sewer allowing the release of hazardous wastes into the environment.

55.   In addition, hazardous wastes from the Chevron Property and the Gregory Village Property have migrated downgradient in groundwater through the subsurface where they are now detected at Plaintiffs' Home.

56.   As a result of Defendants' releases of "hazardous substances," "solid waste," and "hazardous waste," and/or Defendants' knowledge of and failure to abate such releases and/or the migration of the hazardous substances in the groundwater, soil and/or subsurface, Plaintiffs have been exposed to PCE vapors in Plaintiffs' Home.   Plaintiffs fear for their health and safety and for the value of their investment in their home.   Further, Plaintiffs fear for the health of the environment, for their infant child, their pets, and each other.   In addition, Plaintiffs fear for their financial health and the ability to use and enjoy their home, including the ability to be safe and secure in the home, to sell, refinance, rent or otherwise use their property without a stigma or cloud over Plaintiffs' Home caused by Defendants. Plaintiffs have already suffered the loss of two cats dying – one of which was from leukemia, a disease which Plaintiffs' believe is linked to the toxic contamination.

**FIRST CAUSE OF ACTION**
**(RCRA – Abatement of an Imminent and Substantial Endangerment)**
**(Against All Defendants Except Piccolo Properties LP)**

57.   Plaintiffs reallege and incorporate by reference the allegations set forth above in paragraphs 1 through 56, inclusive, as though set forth in full herein.

58.   Nuisance principles form the core doctrinal foundation for modern environmental statutes, including RCRA.   And like nuisance law, RCRA is held to impose liability on the basis of strict liability.   For instance, nuisance law holds mere *current* property owners *strictly* liable for nuisance conditions on or emanating from their property even when they had no part in creating the nuisance; the mere fact that they are maintaining (failing to abate) a nuisance on or emanating from their property subjects them to liability. RCRA has similarly been interpreted to hold mere *current* property owners *strictly* liable for conditions on or emanating from their property that present or may present an

1    imminent and substantial endangerment to human health or the environment even when they had no

2    part in creating those conditions; they are liable merely for maintaining (failing to abate) those

3    conditions. Besides being consistent with nuisance law, this interpretation of RCRA is also consistent

4    with RCRA's legislative history. *See* S.REP. NO. 96-172, at 5 (1979), *reprinted in* 1980 U.S.C.C.A.N.

5    5019, 5023 (stating that "[RCRA] is essentially a codification of common law public nuisance remedies

6    . . . [and], therefore, incorporates the legal theories used for centuries to assess liability for creating a

7    public nuisance. . . ."); H.R.REP. NO. 98-198, Part I, at 48 (1983), *reprinted in* 1984 U.S.C.C.A.N.

8    5576, 5607 (stating that "anyone who has contributed or is contributing to the creation, existence, or

9    *maintenance* of an imminent and substantial endangerment is subject to [RCRA]") (emphasis added).

10       59.   Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B), under which Plaintiffs bring this

11    action, is RCRA's citizen enforcement provision.

12       60.   Any person may bring a lawsuit under RCRA § 7002(a)(1)(B) when: (a) a "solid or hazardous

13    waste" (b) "may present an imminent and substantial endangerment to health or the environment" and

14    (c) the defendant falls within one of the categories of entities that Congress declared liable for taking

15    abatement action or "such other action as [this Court determines] may be necessary."

16       61.   The persons declared liable by Congress for abatement of potential endangerments under

17    RCRA § 7002(a)(1)(B) are entities that contributed to "past or present handling, storage, treatment,

18    transportation, or disposal" of the "hazardous wastes" and "solid wastes" at issue. Pursuant to the

19    express terms of RCRA § 7002(a)(1)(B), these entities specifically include "any past or present

20    *generator*, past or present *transporter*, or past or present *owner or operator* of a treatment, storage, or

21    disposal facility." (Emphasis added.)

22       62.   Under RCRA § 1004(27), 42 U.S.C. § 6903(27), "solid waste" is "*discarded material*,

23    including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial,

24    mining, and agricultural operations, and from community activities." (Emphasis added.) The term,

25    however, does not include "solid or dissolved material in domestic sewage, or solid or dissolved

26    materials in irrigation return flows or industrial discharges which are point sources subject to permits

27    under Section 1342 of Title 33. . . ."

28       63.   None of the discharges from any of the Defendants is solid or dissolved material in domestic



1   sewage, or solid or dissolved materials in irrigation return flows or industrial discharges which are point

2   sources subject to permits under Section 1342 of Title 33.

3       64.   Under Section 1004(5) of RCRA, 42 U.S.C. § 6903(5), "hazardous waste" is "a *solid waste*,

4   or combination of solid wastes, *which* because of its quantity, concentration, or physical, chemical, or

5   infectious characteristics *may . . . pose a substantial present or potential hazard* to human health or the

6   environment when improperly treated, stored, transported or disposed of, or *otherwise managed*."

7   (Emphasis added.)

8       65.   Under Section 1004(3) of RCRA, 42 U.S.C. § 6903(3), "disposal" means "the discharge,

9   deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or

10  on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter

11  the environment or be emitted into the air or discharged into any waters, including ground waters."

12      66.   Pursuant to authority under Section 3001 of RCRA, 42 U.S.C. § 6921, the Administrator of

13  the U.S. E.P.A. promulgated regulations at 40 C.F.R., Part 261 listing or identifying certain hazardous

14  wastes that the Administrator elects to subject to the strict regulatory program established in Subtitle

15  III of RCRA, 42 U.S.C. §§ 6921-6931. Pursuant to RCRA § 7006(a)(1), 42 U.S.C. § 6976(a)(1), any

16  RCRA hazardous waste finally so "listed or identified" by the Administrator following formal, "notice

17  and comment" rule-making as being subject to the hazardous waste regulatory program set forth in

18  Subtitle III of RCRA, has been finally and conclusively determined for all purposes of any RCRA

19  enforcement action, including the instant one, to be a "hazardous waste" as defined by RCRA

20  § 1004(5). However, for purposes of RCRA § 7002(a)(1)(B) citizen suits, substances also qualify as

21  "hazardous wastes" and "solid wastes" when the above statutory definitions (i.e., those set forth in

22  RCRA §§ 1004(5) and (27)) are met.  (40 C.F.R. § 261.1(b)(2).)

23      67.   Plaintiffs and each Defendant are each a "person" within the meaning of RCRA § 1004(15),

24  42 U.S.C. § 6903(15).

25      68.   PCE, TCE, DCE, vinyl chloride, and the other hazardous wastes released into the environment

26  at the Site are each a solid waste because it is discarded material resulting from industrial and

27  commercial operations.

28      69.   PCE, TCE, DCE, vinyl chloride, and the other hazardous wastes released into the environment

1  at the Site are each a "hazardous waste" because of its concentration, or physical or chemical

2  characteristics, its poses a substantial present or potential hazard to human health or the environment

3  when improperly treated, stored, transported, disposed of, or otherwise managed.

4      70.   Each of the Defendants caused or contributed to the past or present handling, storage,

5  treatment, transportation, or disposal of "solid wastes," "hazardous wastes," "wastes," and "hazardous

6  substances" in the environment in, at, and around the Site, including the waters of the State of

7  California, because each Defendant released or otherwise discarded PCE, TCE, DCE, vinyl chloride,

8  and other hazardous wastes, or controlled the properties from which PCE, TCE, DCE, vinyl chloride,

9  and other hazardous wastes were released or otherwise discarded, but failed to prevent or abate this

10 "solid waste," "hazardous waste," "waste," and "hazardous substance" contamination.

11     71.   Gregory Village Partners "contributed" and is "contributing" to the past or present handling,

12 storage, treatment, transportation, and/or disposal of hazardous waste that presents or may present an

13 imminent and substantial endangerment to human health or the environment. It is a sophisticated real

14 estate developer with vast experience in and a business model that involves purchasing and

15 redeveloping properties it knows to be contaminated. And, in fact, it purchased the Gregory Village

16 Property with full knowledge that an imminent and substantial endangerment existed or potentially

17 existed at and/or was emanating from the property from the use, handling, generation, transportation,

18 releases, and/or disposals of hazardous wastes from at least the dry cleaning, silver plating and furniture

19 stripping operations at the property. Since taking title to the property, Gregory Village Partners has

20 acted as a landlord for the dry cleaning and silver plating tenants and has exercised a significant

21 measure of control over their continued use, handling, generation, transportation, releases, and/or

22 disposals of hazardous wastes that present or may present an imminent and substantial endangerment

23 to human health or the environment. Gregory Village Partners also took possession of and title to dry

24 cleaning equipment and PCE, and in the process of dealing with that equipment and PCE, have used,

25 handled, generated, stored, transported, released, and/or disposed of hazardous wastes in such a way

26 as to contribute to the actual or potential imminent and substantial endangerment to human health or

27 the environment at the Site. Gregory Village Partners is also liable under RCRA as a successor in

28 interest to, an assignee of, and an indemnitor for, Kenlow. Moreover, Gregory Village Partners has

1   owned the property now for approximately 15 years and has yet to complete the characterization of the

2   vertical and horizontal extent of the contamination at and emanating from its property or to adequately

3   abate such contamination. Furthermore, Gregory Village Partners has agreed to indemnify some of its

4   current tenants from claims related to the contamination at and/or emanating from its property. Finally,

5   given that property owners have a duty not to maintain such endangerments on or emanating from their

6   properties, Gregory Village Partners is also liable under RCRA for its long-standing indifference,

7   inaction, and failure to act to abate, or at least prevent the spread and migration of, the contamination

8   and the resulting potential increase in the risks posed by the endangerment to the environment and

9   human health.

10   72.   The presence of PCE, TCE, DCE, vinyl chloride, and other hazardous wastes in the soil,

11   saturated subsurface zone, and in the groundwater in, at, around, and in the vicinity of the Site **may**

12   present an imminent and substantial endangerment to human health or the environment.

13   73.   Defendants' liability for such relief as the Court may determine appropriate and necessary

14   under RCRA § 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), is strict, joint and several.

15   74.   Plaintiffs have given the U.S. Attorney General and the EPA Administrator notice of the

16   commencement of this action, as required by RCRA § 7002(b)(2)(F), 42 U.S.C. § 6972(b)(2)(F).

17   75.   Plaintiffs are entitled to relief under RCRA § 7002(a), 42 U.S.C. § 6972(a), restraining

18   Defendants and requiring each of them, jointly and severally, to take such action, including a complete,

19   timely and appropriate investigation and abatement of all actual and potential endangerments arising

20   from the solid wastes and hazardous wastes at and emanating from the Site.

21
**SECOND CAUSE OF ACTION**
**(Abatement of a Public Nuisance)**
22
**(Against All Defendants)**

23   76.   Plaintiffs reallege and incorporate by reference the allegations set forth above in paragraphs

24   1 through 75, inclusive, as though set forth in full herein.

25   77.   Section 3479 of the Civil Code defines a "nuisance," in relevant part, as "[a]nything which

26   is injurious to health, . . . or is indecent or offensive to the senses, or an obstruction to the free use of

27   the property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully



28   obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay stream,

1  canal or basin."

2       78.   Section 3480 of the Civil Code defines a "public nuisance" as:  "[o]ne which affects at the

3  same time an entire community or neighborhood, or any considerable number of persons, although the

4  extent of the annoyance or damage inflicted upon individuals may be unequal."

5       79.   Section 3483 of the Civil Code states that "[e]very successive owner of property who neglects

6  to abate a continuing nuisance upon, or in the use of, such property, created by a former owner, is liable

7  therefor in the same manner as the one who first created it."

8       80.   Each of the Defendants caused or contributed to the presence of "solid wastes," "hazardous

9  wastes," "wastes," and "hazardous substances" in the environment in, at, and around the Site, including

10  the waters of the State of California, because each Defendant released or otherwise discarded PCE,

11  TCE, DCE, vinyl chloride, and other hazardous wastes, or controlled the properties from which PCE,

12  TCE, DCE, vinyl chloride, and other hazardous wastes were released or otherwise discarded, but failed

13  to prevent or abate this "solid waste," "hazardous waste," "waste," and "hazardous substance"

14  contamination.

15      81.   Defendants' acts and omissions in causing or contributing to releases of "solid wastes,"

16  "hazardous wastes," "wastes," and "hazardous substances" in, at, around, and in the vicinity of the Site

17  create a condition that is injurious to health, is indecent or offensive to the senses, and is an obstruction

18  to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or

19  unlawfully obstructs the free passage or use, in the customary manner, of a "basin," namely the aquifer

20  underlying the Site, within the meaning of Section 3479 of the Civil Code, as well as the Defendants'

21  failure to abate these conditions at or emanating from their properties and/or operations.

22      82.   On information and belief, each of the landlord Defendants was aware of the contamination

23  at the time they acquired their respective properties, was aware of the nuisance, was aware of the

24  specific dangerous conditions that created the nuisance, e.g., the hazardous waste releases, was aware

25  that the contamination would continue to spread in the environment, was aware of the tenants' use

26  and/or handling of hazardous wastes, acted with a conscious disregard to the public health and safety,

27  and was in a position to, but failed to, prevent or abate the contamination or the further spread of the

28  contamination. On information and belief, the M.B. defendants also released hazardous substances to

-20-

FOURTH AMENDED COMPLAINT

1    the surface and sub-surface in the environment as part of their car-washing operations.

2    83.   The public nuisance condition and related endangerments to health and the environment

3    arising from released hazardous substances in, at, around, and in the vicinity of the Site affects the

4    entire surrounding community because it interferes with the free use and enjoyment of publicly-owned

5    property and natural resources, including the groundwater within and downgradient of the Site.

6    84.   Defendants have caused, created, maintained, contributed to, and neglected to abate a "public

7    nuisance," as defined in Civil Code §§ 3479 and 3480, namely the potential endangerments to health

8    and the environment created by the "solid waste," "hazardous waste," "waste," or "hazardous

9    substance" contamination at the Site.

10   85.   Plaintiffs have suffered special injury and damages as a direct and proximate result of the

11   contamination at and emanating from Defendants' respective facilities as the public nuisance has or

12   threatens to damage Plaintiffs' health, safety, use and enjoy of the Plaintiffs' home and property, as well

13   as the vapor in and groundwater beneath Plaintiffs' Home and the parents' concern for their infant and

14   unborn child's health and well being.

15   86.   The continuing nuisance complained of is abatable. Plaintiffs have demanded that Defendants

16   abate the nuisance complained of, and hereby reiterate that demand.

17   87.   Defendants are strictly and jointly and severally liable for abatement of the public nuisance.

18   88.   Plaintiffs are entitled to relief, restraining Defendants and requiring each of them, jointly and

19   severally, promptly and competently to take such action as may be necessary to abate the public

20   nuisance and for reimbursing Plaintiffs for all response costs incurred and to be incurred at the Site.

21   89.   The releases and disposals of PCE, TCE, DCE, vinyl chloride, and other hazardous wastes as

22   alleged herein are violations of Contra Costa County Code § 1014-6.002 *et seq.,* which violations are

23   declared and deemed to be public nuisances pursuant to Contra Costa County Code § 1014-6.012. The

24   releases and disposals also violate California Code of Civil Procedure section 731, California Penal

25   Code section 374.8, City of Pleasant Hill ordinances, Contra Costa County codes, CCCSD permits and

26   regulations, California Water Code sections 13050(d), 13050(m), 13304, 13350, and 13387, California

27   Health and Safety Code sections 5411, 5411.5, and 117555, California Fish and Game Code section

28   5650, and Civil Code sections 3479-3480, the purpose of which are to set a standard of care or conduct