```
1                   UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF CALIFORNIA

3           UNITED STATES DISTRICT JUDGE JON S. TIGAR

4                                    Pages 1 - 35

5    Ryan Schaeffer, et al.,          )

6                    Plaintiffs,      )

7                                     )

8    vs.                              )   Case No. CV 13-4358-JST

9                                     )

10   Gregory Village Partners, L.P.,  )

11   et al.,                          )

12                    Defendants.     )

13   _____ )

14


15   San Francisco, California, Thursday, May 7, 2015

16

17     FOR PLAINTIFFS:          PALADIN LAW GROUP, LLP
                                BY:  JOHN RICHARD TILL
                                     KIRK MATTHEW TRACY
18                              1176 BOULEVARD WAY - SUITE 200
                                WALNUT CREEK, CA 94595
19
       FOR DEFENDANT GREGORY    STANZLER LAW GROUP
20     VILLAGE PARTNERS:        BY:  JEFFREY M. CURTISS
                                     JORDAN S. STANZLER
21                              2275 EAST BAYSHORE ROAD - SUITE 100
                                PALO ALTO, CA 94303
22
       FOR CHEVRON USA, INC.:   ROGERS, JOSEPH, O'DONNELL, PC
23                              BY:  ROBERT C. GOODMAN
                                311 CALIFORNIA STREET - 10TH FLOOR
24                              SAN FRANCISCO, CA  94104

25     Reported By:  Pamela A. Batalo, CSR No. 3593, RMR, FCRR,
                     Official Reporter
```

San Francisco, California, Thursday, May 7, 2015          2:39 p.m.

-oOo-

THE CLERK:  Calling Civil 13-4358, *Ryan Schaeffer,*
*et al., vs. Gregory Village Partners, L.P., et al.*

Counsel, will you please step forward and make your
appearances.

MR. TILL:  Good afternoon, your Honor.  John Till
representing the plaintiffs.

MR. TRACY:  Kirk Tracy representing plaintiffs.

MR. STANZLER:  Good afternoon, your Honor.  Jordan
Stanzler -- Stanzler Law Group -- representing Gregory Village.

THE COURT:  Gentlemen, the matter is on calendar for
the plaintiffs' motion for a partial summary judgement.
Plaintiffs can argue first.

MR. TILL:  Just one second, your Honor.

Good afternoon, your Honor.

I struggled a little bit trying to put together what I was
going to address this afternoon.  Because Gregory Village --
they knowingly purchased a piece of -- contaminated piece of
property, they took full responsibility for the investigation
and remediation of that contamination.

More than 17 years later after their purchase, we don't
have a completed investigation and we don't have any active
remediation going on at the site.

These intentional, unreasonable, and strategic decisions to

1    not complete the investigation and clean up have caused the

2    plume to move and continue to migrate, which it continues to do

3    today, impacting both the environment and the neighborhood which

4    includes the plaintiffs' properties.

5              THE COURT:  Is there a time, as a matter of law, at

6    which -- let's assume for a moment that they did -- that they

7    have not adequately investigated or remediated, just for the

8    sake of argument, so I can construct the rest of this

9    hypothetical.

10       I gather that after a year from the purchase of the

11   property, we can agree that it would not be reasonable for a

12   district court judge to hold that, as a matter of law, they had

13   not satisfied their duty to investigate or remediate; that that

14   would not be an adequate amount of time.  Right?

15             MR. TILL:  Potentially your Honor, yes.

16             THE COURT:  Well, on these facts.

17             MR. TILL:  On these facts, yes, your Honor.

18             THE COURT:  Okay.  And your argument is that after 17

19   years, I can do that; correct?

20             MR. TILL:  Yes, your Honor.

21             THE COURT:  What was the date on which the law changed

22   from one to the other?

23             MR. TILL:  Your Honor, I think --

24             THE COURT:  Because I need that for my order.

25             MR. TILL:  Well, your Honor, I think the problem is

1   that it's not just -- I don't think it's necessarily based on a

2   date.  I think it's based on the conduct and the knowledge of

3   the -- at the time that they purchased the property, they knew

4   that the contamination was in the groundwater and that it was

5   migrating and they did not go out and say *well, we're going to*

6   *investigate this*, despite the fact that the Regional Board asked

7   them many, many times to go out and start investigating

8   off-site, as early as 2002 that I have documented.

9        I think at some point in time between 2002 and 2010, when

10  they actually went out and did the significant component of the

11  soil vapor sampling that needed to be done, which isn't

12  completed yet, I think at that point in time -- during that

13  period of time, I should say, is when it went from being

14  reasonable conduct as a matter of law and unreasonable conduct

15  as a matter of law.

16       And I think that if I could crystalize a date for the

17  Court, it would be December of 2008, and if you look at

18  Mr. Brown's -- Captain Brown's deposition and Exhibit 9 of that

19  deposition where counsel for Gregory Village said *Regional*

20  *Board, don't issue an order.  We're really concerned about the*

21  *visibility of the plumes in the area and we are very concerned*

22  *about toxic tort liability,* there they knew -- they knew at that

23  point in time and before that, I would argue -- but at least by

24  that point in time, they knew it was moving off-site.  They knew

25  they had potential liability to other plaintiffs.  They knew

1   that they had potentially residents being exposed to

2   contamination, and they didn't want the Regional Board to issue

3   an order because that would raise the visibility of the problem.

4            THE COURT:  The argument is that an omission -- that

5   Gregory Village's omissions were unreasonable as a matter of

6   law; correct?

7            MR. TILL:  I believe it's both their omissions and

8   their intentional decisions not to act.

9            THE COURT:  Okay.  I'm going to call those intentional

10  omissions, because that's what those are.

11     So we do, in the law, have not a lot, but we do have

12  examples of intentional omissions that are, per se,

13  unreasonable.

14     I had a lot of automobile accident cases in the state

15  court.  I never had this one, but I feel confident in saying

16  that if, as a driver, I'm conveying you, as a passenger, in my

17  car and I have omitted to install or have someone install seat

18  belts in the car, that that omission is unreasonable, putting

19  aside the negligence per se issue and the fact that it's

20  required by statute.  Even in the absence of that, we can say

21  okay, that's unreasonable as a matter of law.

22     If I were making a list -- coming back to this case, if I

23  were making a list of the things that Gregory Village didn't do,

24  that their failure to do was unreasonable as a matter of law,

25  what would be on the list?

1          MR. TILL:  Your Honor, I think Dr. Farr addresses many

2    of these issues.  However, if I had to create a list, I would

3    say they have failed to timely investigate.  They have failed to

4    timely abate the continuing migration of the contamination at

5    the site.  I don't just mean at the plaintiffs' property, but I

6    mean the entire site.

7          They failed to manage their tenant's property and their

8    property, which they own and operate as a business, in order to

9    prevent harm to outside parties.

10          They failed to comply with the Board -- with the Board's

11    request to complete investigation of both the nature and extent

12    of the contamination at the site.  They failed to abate ground

13    water contamination.

14          In addition, they failed to prevent the migration of the

15    contamination off their property.  They failed to stop the

16    migration from impacting third parties, which they knew was a

17    possibility because of their concern with regards to toxic tort

18    and therefore it was a foreseeable decision that they might be

19    impacting third parties, such as the plaintiffs.

20          They delayed their investigation in order to gain the

21    benefit of time value of money in order -- at the expense of

22    potentially exposing other parties at the site.

23          In addition, the failure to investigate the toxic

24    contaminations that were used by other tenants at the site,

25    which still exists today, is yet another example of Gregory

1    Village attempting not to understand the complexity of the

2    issues at hand and doing it in an intentional and willful

3    manner.

4            THE COURT:  Okay.  That's a good answer to my

5    question.  But you're still free to make the argument you came

6    to make.

7            MR. TILL:  I believe, your Honor, that Gregory Village

8    made the intentional choice of purchasing this property and then

9    hoping through natural attenuation that it wouldn't get any

10   worse.  And I believe that the problem with that approach is

11   that the signs demonstrate, I think, both by our experts, their

12   expert, as well as the Regional Board's order, which they

13   submitted and request judicial notice of, that Gregory Village

14   was in the position to stop this from becoming a worse problem.

15       They have been identified by the Regional Board as a

16   discharger, identified by the Regional Board as somebody that is

17   in control of the property and has the ability to control and

18   prevent the spread of the contamination.

19       That is the same or very similar to what Dr. Farr set forth

20   in her declaration at Paragraphs 11 and 36 where Dr. Farr

21   establishes that the delay in both the investigation and the

22   remediation of the contamination has extended the plaintiffs'

23   exposure and allowed the continued migration both in the

24   environment and the neighborhood.

25       I find it interesting that at this point in time, that

1   Gregory Village didn't really object to any of our evidence at

2   all.  There were no evidentiary objections submitted by Gregory

3   Village.

4        The plaintiffs have objected to the evidence that was

5   submitted by Gregory Village, except to the extent of the

6   Regional Board orders, which we believe is a proper request for

7   judicial notice.

8        Gregory Village doesn't really oppose most of the elements

9   of most of our causes of action that we assert in this case in

10  this motion.

11       We have asserted -- sorry, your Honor.

12            THE COURT:  I think the core of the parties' fight is

13  whether the Court can conclude that causation has been

14  established as a matter of law.

15       There are lots of things going on in this motion.  I don't

16  mean to suggest it's a one-issue motion or that the order will

17  be a one-issue order.  That's not true.  But I think the core of

18  the parties' fight is the defendants' argument that causation

19  has not been established as a matter of law; that there still

20  are disputes of fact for the jury to resolve on that issue.  And

21  the reason I say it's the core is because if the defendants are

22  right about that, it has a domino effect on the whole motion.

23            MR. TILL:  Your Honor, if I may, I would like to

24  address that because I understand that that -- I agree with the

25  Court that I think that that was the core of their opposition.

1    And I think it's also interesting to note that the case

2    that they cite, which they called the seminal case, is the

3    *Castaic* case, and in that *Castaic* case, they set forth three

4    elements in order to determine causation in a dual property

5    contamination case, which was a CERCLA case in part and a

6    nuisance case in another part.  But the nuisance case refers

7    back up to the CERCLA causation to termination.

8    The first two elements in that causal discussion in that

9    case, which they cite as the seminal case on the issue, is first

10   that the plaintiff can show that the contamination that is at

11   their property is the same or similar contamination that is at

12   the defendants' property.

13   Here we have PCE at the plaintiffs' property.  We have a

14   declaration from Anne Farr that it's a commingled plume from the

15   dry cleaning facilities that operated at Gregory Village's mall,

16   where you also find the same contamination.

17   In the next part of their argument, which I believe we

18   point out in our reply brief pretty significantly, is after they

19   set up that status, they then say -- and I'm sorry, your Honor.

20   Can I get the quote on that, on the case?

21   The third part of that test, your Honor, is provide

22   evidence of a plausible migration pathway by which the

23   contamination could have traveled from the defendants' facility

24   to the plaintiffs' cite.  Well --

25       THE COURT:  That's what you need to do to survive a

```
1   motion for summary judgement that your opponent files.
2          MR. TILL:  I'm sorry?  Say that --
3          THE COURT:  The thing you just said is what you need
4   to do to survive a summary judgement motion that your opponent
5   files if you are the plaintiff in an environmental case.
6      What you have to do, if you're the plaintiff, is provide
7   evidence of a plausible path as to which the evidence is
8   undisputed.
9          MR. TILL:  Agreed, your Honor.  I don't think that
10  there is any -- well, because they didn't object to any of our
11  evidence, I don't think there is any disputed evidence with
12  regards to the fact that we are dealing with not just causation
13  to the plaintiffs' property but causation to the entire site.
14     So when you start talking about whether or not there is
15  causation, the defendants have tried to say well, the
16  plaintiff's property -- the plaintiff has to show that there is
17  causation for that chemical to have gotten to the plaintiff's
18  property.  But that's not the limitation of our motion.
19     Our motion is talking about a public nuisance that is at
20  and emanating from Gregory Village and the causation is -- all
21  of their sampling and testing is the evidence that shows that it
22  came from and it's at and emanating their site.
23     Then in their motion, they establish a plausible pathway.
24  They set up the plausible pathway that the dry cleaners took
25  their chemicals, at least in part, and some of it went into the
```

1  sewer -- well, the private lateral, I should say -- into the

2  private lateral, which Gregory Village owns, which then was

3  discharged into the Sanitary Sewer District and then traveled

4  along the Sanitary Sewer District and was discharged someplace

5  else.  Well, that's a plausible pathway.

6      Dr. Farr says and the Regional Board says that the

7  contamination from the dry cleaning facilities at Gregory

8  Village has traveled in the subsurface via the groundwater

9  migration, and along with the groundwater migration, the

10  chemicals have migrated.

11      THE COURT:  Do I have to disregard the Miller

12  declaration to conclude that there is no dispute of material

13  fact, do you think?

14      MR. TILL:  No, your Honor.  Because I think that the

15  defendants establish a plausible pathway on their very own

16  without any help from us.  And then our expert doesn't

17  necessarily disagree that the sewers might be part of the

18  pathway that -- but they're not mutually exclusive.

19      There is two pathways here and one is the sewer.  But the

20  problem with what Gregory Village has argued is it's the

21  assumption in a vacuum that --

22      THE COURT:  When you talk --

23      MR. TILL:  -- the chemicals didn't come from

24  somewhere.

25      THE COURT:  So we -- and this is my doing, not yours,

1    but we've switched focuses or foci, maybe you're supposed to

2    say, between the allegation that Gregory Village didn't

3    adequately investigate or remediate the property to the under --

4    the source of the underlying contamination.  We're in a

5    different topic now.

6        And my question is -- to make sure that I'm staying on

7    point -- is whether the pollution that you're talking about now

8    occurred before or after Gregory Village acquired the property.

9            MR. TILL:  Well, your Honor, I think that --

10           THE COURT:  The pathway you're talking about, the dry

11   cleaner dumping the chemicals and it goes in the private lateral

12   and all that, this is before Gregory Village acquired the

13   property; correct?

14           MR. TILL:  Correct, your Honor.

15           THE COURT:  I mean, I remember the part in the papers

16   about they were moving some machines and they tried to get the

17   chemicals out and maybe some chemicals spilled out of the

18   machines when Gregory Village was wrapping up the property.

19       Excluding that, the dry cleaner's chemical becoming

20   pollution in the neighborhood, that occurred prior to their

21   ownership; right?  So if that's right, isn't that a Kenlow

22   issue?

23           MR. TILL:  Well, in part it is a Kenlow issue,

24   your Honor, but 3483 of the Civil Code says that a successor

25   owner is just as responsible for not negating a nuisance as the

1    prior owner who created it, and so --

2         THE COURT:  But then we're back to what we were

3    talking about before, which is has their conduct in remediating

4    and investigating been reasonable.

5         MR. TILL:  Well, to a certain degree, your Honor, I

6    would agree, except for the fact that if you look at the Penal

7    Code 372, which is actually cited in one of their cases, it's in

8    *People vs. Gallo* 1103, your Honor, and it doesn't quote the

9    section, but instead what it says -- sorry, your Honor, but I

10   have the quote or I have what I think to be the pertinent part

11   of the 372, which is "Every person who maintains or commits any

12   public nuisance or who willfully omits to perform any legal duty

13   related to the removal of a public nuisance is guilty of a

14   misdemeanor," period.

15      I think that's very telling, your Honor, in this particular

16   setting, 17 years after buying a piece of property that they

17   knew was contaminated.

18      I think the problem here, your Honor, is that the process

19   which has occurred at this site is, yes, a vast majority of the

20   contamination probably occurred before they purchased the

21   property.

22         THE COURT:  Let me be clear about the intent behind my

23   questions.

24      Gregory Village's conduct might be abhorrent.  Okay?  They

25   might have done a terrible job of investigating and remediating.

1    I'm not saying they have.  I'm just saying maybe that's right.

2        But what I have to decide today is has that been decided as

3    a matter of law?  Has what they've put in on this motion so

4    failed to rebut any of these charges that I shouldn't even let a

5    jury decide it?

6        MR. TILL:  I think the answer is yes, your Honor.  I

7    mean, I think that, you know -- I think that what they did as

8    far as to try to demonstrate that they acted reasonably is they

9    had in-house counsel where they've stood up and protected all of

10   these communications with her internally and so on and so forth,

11   put in a declaration where I'm not sure she has personal

12   knowledge of many of the things that are stated in there.  I

13   don't know that -- many of those statements that she reiterates

14   appear to be hearsay.  There is no basis for her ability to

15   opine on whether or not that meets some kind of reasonable

16   standard for investigation and remediation at a site.

17       Dr. Farr says, "These delays and the investigation is still

18   going.  The contamination is still moving.  The delay has

19   exposed the plaintiffs to significant exposure, and there is an

20   imminent and substantial danger, both to the environment and to

21   the public health."

22       Remember, the standard -- and this is not a *Richter* case

23   because that was dismissed in the lower case --

24       THE COURT:  I guess what I'm signaling to you is that

25   Dr. Farr's opinion might be totally correct, but figuring that

1  out is not the dominant purpose of the hearing.  That is the

2  dominant purpose of direct examination of Dr. Farr and closing

3  argument in the trial.

4      The dominant purpose of this hearing is to figure out why

5  everything their except says is incorrect because that's how

6  summary judgement works.

7      So I'm not telling you don't talk about Dr. Farr.  You can

8  if you want.  But that's not where the fight is this afternoon.

9          MR. TILL:  But I think it's very telling, your Honor,

10  that in Mr. Miller's declaration, he doesn't ever say they acted

11  reasonably.  He doesn't say that their investigation was

12  sufficient.  He doesn't say that their remediation has been

13  sufficient.

14          THE COURT:  He doesn't concede causation far enough to

15  reach any of those points.  He said that the origin of the PCE

16  detected at the plaintiffs' property cannot be determined.

17          MR. TILL:  Because it's an indivisible plume,

18  your Honor, which is consistent with what Dr. Farr says.  The

19  reason -- we don't have to get to causation to the plaintiffs'

20  property because we're talking about the whole site.  And Anne

21  Farr says it's an indivisible plume.  It's all mixed up

22  together.  There might be other sources out there.  They point

23  to these other chemicals that, in speculation, maybe somebody in

24  the neighborhood used and maybe they got into the sewer and then

25  if they got into the sewer, maybe that's what we're seeing.

1    That's all speculation.  There is no facts in that basis at all.

2    There is not even a basis for that opinion, your Honor.

3        I submit to the Court that they have completely --

4            THE COURT:  Well, then that goes back to the question

5    I asked you earlier.  Do I need to disregard the Miller

6    declaration for you to win?  And maybe your answer is no,

7    because no lawyer would ever concede that point.  You say,

8    *Your Honor, we win whether you consider it or not.*

9        But you could say *but you shouldn't consider it because*

10   *it's too speculative.*  As to that at least there is some pretty

11   good law.

12           MR. TILL:  And we did object to that in our motion.

13           THE COURT:  Yes.

14           MR. TILL:  And we do think that you could strike most,

15   if not all, of the Miller declaration under the evidentiary

16   objections that we've provided.

17       We think that the Miller declaration is not based on facts.

18   We think that it's speculative at best with regards to -- we

19   think that there is all kinds of problems with the Miller

20   declaration and it doesn't address whether or not GVP acted

21   reasonably.  That's not the focus of the Miller declaration.

22   That's the focus or the attempted focus of Ms. Haber's

23   declaration.  Miller doesn't address that issue.

24           THE COURT:  Right.  I agree with that.

25           MR. TILL:  And very honestly, I don't believe that

Ms. Haber has the expertise to provide to this Court, unlike Dr. Farr, whether or not the investigation and remediation at the GVP site is sufficient.  In fact, I would argue that she's a biased witness.  She's an employee of the defendant.  She has no basis to make that determination, and not only that, but their attempt to use her declaration is demonstratively short because she says this is a summary of everything we've done, and it's not.

They leave a complete gap during -- as we pointed out -- excuse me, your Honor.  From 2005 until 2009, there is no indication that they did anything.  And this is in the exact time frame when they're asking the Regional Board to do nothing. And it's in the exact time frame when they're concerned because they foresee the possibility that they are exposing people to toxic contamination and therefore they're concerned for toxic liability.  They're not concerned about anything else.  They're concerned about exposure to toxic tort litigation.

But instead in December of 2008 when they asked the Regional Board *don't issue the order*, they didn't go out and say *okay, guys, we need to get moving because the Regional Board is talking about doing an order and we need to finish this investigation and get this place cleaned up.*  That's not what they did.

They sat.  They sat for another two years.  Then after the Regional Board threatened them again, they went out and did the

1  neighborhood investigation.

2      And now four years later, the Regional Board has issued an

3  order which GVP is not complying with and has appealed and has

4  not met one single date under that order.  That is not

5  reasonable conduct.

6      In fact, in the Brown deposition, Exhibit 9 again, the

7  environmental consultant representing GVP said orders are for

8  recalcitrant responsible partners.  Don't issue it here.

9      The Board finally got fed up and issued an order.  Okay.

10 That's great.  Four years after we filed this litigation.

11 But I think it is telling that the Regional Board doesn't really

12 mince any words.

13     GVP is responsible and they have not lived up to those

14 responsibilities in order to protect and stop the migration of

15 the contamination, which is a duty they owe to their neighbors

16 and their tenants, for that matter.  They have an obligation to

17 disclose the location -- the release of those contaminations

18 under the Health and Safety Code, which I have only found one

19 lease that actually does that, only one document that actually

20 does that.  Unfortunately I did not submit that to the Court so

21 it is not part --

22         THE COURT:  Those parties have their own --

23         MR. TILL:  But, your Honor, I think it's really

24 telling that for the most part, they don't object to most of the

25 elements that we've asked the Court to look at.  And we did ask

1  the Court that if it determines that it can't issue a summary

2  judgement motion today, that it find that the elements that are

3  not disputed be covered in the order so that we don't have to

4  relitigate those and continue discovery on those and still fight

5  those fights.

6       If the reasonableness is going to be the core of this, then

7  so be it.  But I think that the lack -- I think the evidence

8  that we submitted demonstrates clearly that they have not done

9  enough to protect and fulfill their duty to other parties

10 outside of themselves.

11      I think that they've protected their pocketbooks.  They

12 made a business decision to buy this contaminated piece of

13 property.  They own like 80 properties around the world.  They

14 make this decision all the time.

15      But the point is that they made this decision, and this

16 time they rolled the dice and it was wrong.

17           THE COURT:  Mr. Till, equitable arguments of the kind

18 you are making now are better reserved for juries.

19           MR. TILL:  Appreciate that, your Honor.

20      I already touched on the fact that Mr. Miller's declaration

21 doesn't support that they acted reasonably.  And Ms. Haber's

22 declaration doesn't do that either.

23      In fact, I think that the fact that the 17-year period has

24 been going on -- and we don't even have a nature and extent of

25 the contamination.  Where does it start?  Where does it stop?

1   How deep does it go?  We don't even have that defined yet, 17

2   years later.  I mean, it amounts to a willful disregard, and I

3   don't think that when you start talking about an intentional act

4   in that context, you are focused on whether or not the defendant

5   acted reasonably in a public nuisance, private nuisance context.

6       And I know the case that they cite about the fact that

7   there was an accumulation of soil and logs in a stream and that

8   that's a naturally-occurring condition, which the defendant, a

9   water district, didn't have the obligation to remove it because

10  they didn't create it.

11      But that's a different context.  And the Court actually

12  acknowledges that in that very case and says this is kind of a

13  unique case here because the defendants in that case didn't

14  create the naturally-occurring condition and therefore we think

15  that we should look at whether or not their conduct in not

16  addressing the naturally-occurring condition on their property

17  was reasonable before we address the nuisance.

18      Here what they've done, we have a non-naturally occurring

19  condition, which they knew before they bought it, which

20  continued to migrate -- and by the way, they indicate in their

21  submission based on one of the deposition transcripts that at

22  the time that they bought it, the plume was only 80 feet long.

23  Now it's like 700.  So at the time that they bought the

24  property, if they had gone in with gusto, if you assume and you

25  believe their evidence that they submitted, that means that if

1  they had actually gone in and done it right, then it would have

2  been done.  My plaintiffs would have never been exposed.  It

3  would have been cleaned up before they even bought the property.

4  Before my clients even bought the property, it would have been

5  done if they had just gone in, rather than piecemealing.

6      The first consultant that looked at it said a million

7  dollars.  The second consultant that looked at it, that was not

8  CVP's consultant.  That was the consultant hired by the person

9  that was going to buy the property.  They said maybe more than a

10  million dollars.

11      GVP's consultant said 600,000 and change.  Then he came

12  back and he said 400,000 and change.  Then he came back and said

13  *Well, maybe we can do it for 200,000.*  And guess what got

14  implemented?  The 200,000.

15          THE COURT:  Mr. Till, I'm going to invite you to wrap

16  up.

17          MR. TILL:  Okay.

18      Your Honor, very quickly, they raise several defenses:

19  Primary jurisdiction; mootness, which is their standing

20  argument; consent; and statute of limitations.  I'm happy to

21  address those, but I think it's their burden to prove those, so

22  I would like to reserve time to address those --

23          THE COURT:  I wouldn't worry about the first three

24  things and I'm going to ask them about the statute of

25  limitations.  I don't know how to deal with that being raised as

1   an issue against -- well, anyway --

2          MR. TILL:  Okay.  Thank you, your Honor.  I'll go

3   ahead and stop for now, and I'll reserve some time after they're

4   done.

5          THE COURT:  We'll see what's left.  You have been at

6   the podium for a while.

7          MR. TILL:  Okay.  Thank you, your Honor.

8          THE COURT:  Thank you.

9          MR. CURTISS:  Good afternoon, your Honor.

10     I agree with the Court that causation is the

11  big-ticket item with respect to this motion.  Our position is

12  that the moving party bears the initial burden of demonstrating

13  the absence of a genuine issue of fact and that's from the

14  *Celotex* case.

15     I have reviewed the Farr declaration carefully and I am

16  unable to glean any substantial discussion of causation in that

17  declaration.

18     There is a long discussion about the general properties of

19  PCE.  There is a discussion about Dr. Farr's background.  And

20  there are a couple of conclusory statements about migration

21  which are contained in Paragraphs 11, 12 and 13 and

22  Paragraph 39.

23     Paragraphs 11, 12 and 13 are a summary.  Paragraph 39

24  states, "This commingled plume extends north into the commercial

25  and residential neighborhood downgradient of the two sources of

1    contamination and has migrated onto the Schaeffers' property."

2    There is no citation after Paragraph 39.

3         There is no discussion as to how PCE traveled from the

4    Gregory Village property to the Schaeffer property.  For

5    example, we're left guessing whether it traveled through soil

6    gas, through soil --

7              THE COURT:  Why does that matter?  Why does the

8    particular pathway matter?  That's the first question.

9         The second question is if she has reviewed the

10   underlying -- you know, I'm not saying -- I'm not saying this is

11   your burden, which is to prove that Dr. Farr has not put in any

12   evidence on causation, but since that is the burden you have

13   accepted for the purposes of making your remarks -- not that

14   it's your burden on the motion.  I'm just say why can't somebody

15   of her background and significant experience and expertise read

16   these underlying documents and simply come to the conclusions

17   that she reaches in Paragraph 39?  I mean, I can't imagine

18   granting a motion to strike that testimony at a trial.

19             MR. CURTISS:  Because of Exhibit D to Steve Miller's

20   declaration, which shows a map with a gap in the progression of

21   contamination or -- sorry -- the contamination between the

22   Schaeffer residence and the Gregory Village mall.  So at a

23   minimum, her declaration would have to explain --

24             THE COURT:  Well, now you're coming back to the burden

25   you actually have on this motion, right, which is Mr. Miller

1   disagrees with Dr. Farr and he has got a good reason for doing

2   it.  So there is a dispute of material fact.  I hear myself

3   arguing with you, which is not my intent.

4           MR. CURTISS:  Well, I think it's easier to oppose

5   Dr. Farr's declaration if we know her theory of migration.  If I

6   had to assume what she's getting at, she's probably going -- she

7   probably takes the position that it traveled both through soil

8   and groundwater and through the sanitary sewer system, but there

9   are two key points that need to be rebutted.

10      If you have migration through the soil, how do you explain

11   the dip in detections that occurred as you move away from the

12   Gregory Village property --

13          THE COURT:  Well, that does not eliminate causation

14   because it just means that there is another unidentified source.

15   Gregory Village has to be totally off the hook on causation to

16   escape a finding on liability.  It's like if I take this glass

17   of water and I pour it on my bench and it goes to my right and

18   there is less water as the water travels along, which wouldn't

19   be a surprise, but at the end, there is a lot of water, that

20   just means that there is another source down there somewhere,

21   but it doesn't mean the water from my cup didn't go all the way

22   down there.

23          MR. CURTISS:  I think that's true as a hypothetical.

24   What I would say in response is the only source that we know of

25   is manhole 46 where you have these extremely high concentrations

1   on the southeast corner of the Schaeffer property that cannot be

2   explained by a migration through the subsurface to -- from the

3   Gregory Village property.

4       That's -- sorry.  To also get back to your point, I think

5   that's the importance of the *Celotex* case, which is that they

6   have the initial burden of production.  They haven't established

7   causation and therefore we have no obligation to put forward

8   evidence.  But if we did and we actually did in our

9   opposition --

10          THE COURT:  I think you do.  I think they meet that.

11  So I think the question is doesn't the sentence in the Miller

12  declaration, "the origin of the PCE detected at the plaintiffs'

13  property cannot be determined in Paragraph 5(d)" or the

14  statement in -- numerous of the statements in Paragraph 14 or --

15  I put the tab on the wrong thing.  Sorry.  Now I can't find the

16  thing I was looking for.

17      Here we go.  Paragraph 13, "The likely source of the

18  detected PCE" -- "the likely source" -- "is the CCCSD sewer

19  located a few feet from plaintiffs' property."  That's the

20  dispute.  Your guy says it's that.  He says *I don't know what it*

21  *is but the one thing I think that it's likely is this other*

22  *thing*.  Okay.  That's the dispute.

23          MR. CURTISS:  Your Honor, we have a dispute about

24  causation.  I think it's entirely possible that the proximate

25  cause of the contamination is the Sanitary Sewer District, which

1    allowed PCE to be deposited into its sewer system and which

2    negligently maintained those sewer lines and which presumably

3    the prior owner, the prior operator of the property, reasonably

4    relied upon when conducting their business.

5        You have an intervening act here.  The legal cause is the

6    Sanitary Sewer District.  And furthermore, the detections can't

7    be explained by anything other than this manhole -- the area

8    around manhole 46 and the negligent maintenance of the sewer

9    line; at least, that's our expert's opinion.

10       Now, it's speculative where the PCE came from that exited

11   the sewer at or around manhole 46.  We don't know where it came

12   from.  I don't think it's speculative to say that PCE is in

13   household products.  That was merely a citation to a government

14   agency that our expert made.  I don't think it's speculative

15   that there were other users of PCE in the area.

16       To go back to another point, the plausible migration

17   pathway, that has to do with HSAA, which I would like to

18   separately address.

19       But in any event, what I would expect to establish

20   causation in expert declaration is an actual explanation of the

21   soil type, the lithology, mapping detections between the Gregory

22   Village property and the Schaeffer residence.  But there is none

23   of that in this declaration.  I would think that that's normally

24   how you would attempt to establish causation.

25       Furthermore, I would just like to reemphasize that point

```
 1    because I don't think we made it in our motion.  I don't think
 2    we highlighted it.  But the legal cause of the contamination of
 3    the property would be the sewer line.  And it would be the
 4    allowance -- because the Sanitary Sewer District allowed
 5    discharges into its sewer system and because it would be
 6    reasonable for a prior operator to rely on the integrity of the
 7    sanitary sewer lines, the actual cause of the contamination,
 8    from a legal perspective, is the Sanitary Sewer District.
 9        Furthermore, I don't think that the plaintiffs have shown
10    that any contamination from the Gregory Village property
11    actually reached the Schaeffer residence.  To me, that's a
12    matter of speculation.
13        With respect to HSAA and the plausible migration pathway,
14    HSAA is a cost recovery statute.  The purpose of it is for
15    people who have undergone remediation costs to then subsequently
16    recover those costs in a later action.
17        Here we have response costs that are being incurred as a
18    result of the instant litigation with no intent to fund a
19    cleanup.  I think under the Health and Safety Code, that's not
20    permitted.  Health and Safety Code Section 25363(e) says, in
21    pertinent part, "An action to enforce a claim may be brought as
22    a Cross-Complaint by any defendant in an action brought pursuant
23    to Section 25360 or this section or in separate action after the
24    person seeking contribution or indemnity has paid removal or
25    remedial action costs in accordance with this chapter of the
```

1   Federal Act."

2       So I don't think there is any standing for an HSAA claim

3   and I don't think that causation has been established.

4       Opposing counsel mentioned a few times that there has been

5   no remediation that has occurred.  I think that conveniently

6   omits the sub slab depressurization system which is in the

7   Schaeffer residence.

8           THE COURT:  That's considered -- well, you are the

9   environmental lawyer, but isn't that considered mitigation as

10  opposed to remediation and aren't those words used to describe

11  different things?

12          MR. CURTISS:  I don't think there is a substantial

13  difference.  There is no reason why this sub slab system can't

14  proceed or can't be in effect indefinitely, and, in fact, that

15  has been the case with other sites that we've worked on.  There

16  is no principal reason why --

17          THE COURT:  That's all right.  The order is very

18  unlikely to turn on whether sub slab is more accurately

19  described as mitigation or remediation.

20          MR. CURTISS:  The larger point being I don't see the

21  prejudice that the plaintiffs are suffering because of the

22  contamination at issue.

23      Indoor air, I believe they have conceded, is not an issue

24  now.  They produced the letter from James Embree, Gregory

25  Village's toxicologist, who explains, I think pretty eloquently,

1    why indoor air was not an issue prior to the installation of the

2    system.

3         The incantation of a threat to human health or the

4    environment I think turns on an assumption that people are

5    drinking the groundwater in the area, which is not the case.

6    So I don't know where the threat to human health or the

7    environment is coming from.  I don't know where the threat to

8    the Schaeffers is coming from.

9         With respect to the reasonableness of Gregory Village's

10   response, I think that's a very fact-intensive exercise.  It's

11   difficult for me to convey, in opposition to a summary judgement

12   motion, 17 years of history.  We did submit the declaration of

13   Mary Haber, which to a first approximation, explains what

14   Gregory Village knew, when and how it responded.

15        I dispute opposing counsel's claim that there was a gap

16   that is completely unexplained between 2005 and 2009.  I think

17   if you look at -- your Honor, if you look at Paragraphs 18 to 20

18   of the Haber declaration, there are two dates.  There is one

19   date, 2005, in Paragraph 18, and there is another date of 2008

20   in Paragraph 20.  And in the intervening paragraph, Ms. Haber

21   explains additional investigations took place, and based on the

22   results of those investigations and direction from Regional

23   Board staff, AllWest prepared another remediation plan.

24        If we are going to analyze the reasonableness of Gregory

25   Village, each one of these instances need to be looked at on a

1    granular basis.

2       This is a complicated site.  The GeoTracker website shows

3    voluminous entries.  And I don't think that because of that, the

4    Schaeffers have met their burden as far as summary judgement to

5    show that there is no dispute regarding reasonableness.

6       Furthermore, reasonableness assumes that Gregory Village is

7    the master of its own destiny in this area, but we don't own

8    properties in the neighborhood.  We have to negotiate site

9    agreements.

10      We don't control the sewer district line.  There are other

11   PRPs in the area, namely Chevron.  We have to go through an

12   administrative entity, which we have voluntarily done.  We have

13   not been fined by the Regional Board.

14      All of these things need to be looked at in order to

15   determine reasonableness, which is why it's not appropriate for

16   resolution on summary judgement.

17      Opposing counsel mentioned that there is a current order

18   and that Gregory Village is defying it.  I want to clear the

19   record.

20            THE COURT:  You are appealing it; is that right?

21            MR. CURTISS:  We are appealing it to the extent we are

22   asking the Regional Board to add the Sanitary Sewer District.

23   We have also submitted financial documents showing Gregory

24   Village --

25            THE COURT:  Add them but not to delete Gregory

1   Village?

2        MR. CURTISS:  Correct.

3      We are submitting financial documents showing our ability

4   to pay and we are negotiating with Regional Board to fashion a

5   remedy that is consistent with our financial ability, and that

6   is currently under submission by the Regional Board.

7      So there is no evidence that we're being obstinate.  In

8   fact, we have every intention of complying with the Regional

9   Board given that this is a very expensive process.  You are

10  talking about a single-asset entity with limited funds to

11  address a regional contamination problem.

12     One last point, your Honor, unless you have further

13  questions.

14     We cited some authority in our opposition indicating that

15  we believe it's appropriate for the Regional Board to be the

16  entity that's fashioning injunctive relief in this action based

17  on their ongoing oversight.

18        THE COURT:  It strikes me this is probably not the

19  time and place for that argument to be made.  I'm not expressing

20  a view as to the merits of it, but making that plain opposition

21  of the plaintiffs' motion for summary judgement seems to me to

22  be not the best place in terms of notice and due process.

23        MR. CURTISS:  Very well.  Thank you, your Honor.

24        THE COURT:  Thank you.

25     Mr. Till, it's your burden.  You can have five minutes.  I

```
 1    will tell you you argued for 37 minutes before.
 2              MR. TILL:  Yes, your Honor.
 3         So, your Honor, in the opposition brief, Gregory Village
 4    says the sanitary sewer is the source and the pathway to the
 5    contamination.  Anne Farr doesn't disagree with that, but -- and
 6    she indicates that Gregory Village was the source or -- I'm
 7    sorry -- the dry cleaners were the source.  That it may have
 8    entered into the sewer system.  That may be one pathway, as I
 9    said previously.
10         But both the Regional Board and Anne Farr indicate that the
11    contamination came from the dry cleaners.  This is an
12    indivisible source and plume and that it's in the neighborhood,
13    including where my plaintiffs' house is.
14        I mean, I don't think causation -- I know it's the crux of
15    their argument.  I actually don't think it's really disputed.
16    If you look at their Complaint that they filed against Chevron,
17    which we requested judicial notice on, they admit that the dry
18    cleaners at their property is the source.  They admit that the
19    contamination has moved into the neighborhood from the dry
20    cleaners that operated at their property.  It's not really a
21    dispute.  There is not really a dispute as to where this
22    contamination came from.
23         Now, there may be other sources.  I won't say that there
24    aren't other sources, your Honor, but the idea that the sanitary
25    sewer is the source when we already heard this argument in
```

1   opposition to the motion for good faith determination where this

2   Court determined that even if they were a source, they were a

3   de minimis source.

4       And I would submit that that came out --

5           THE COURT:  No.  I didn't make that determination.  I

6   made the determination using the Tech-Bilt factors that the

7   settlement was reasonable, evaluating all of the probabilities

8   that the parties had in front of them, including the decision by

9   the Regional Water Board that Contra Costa was de minimis.  I

10  didn't adopt that finding.  That issue was not before me.

11          MR. TILL:  Fair enough, your Honor.  Sorry.  I

12  misspoke.

13      As far as the Anne Farr declaration, counsel indicates that

14  there is no indication whatsoever within that as far as

15  causation, and I would submit that that is not an accurate

16  statement.  I believe I previously pointed the Court -- --

17          THE COURT:  To paragraph 36.

18          MR. TILL:  Paragraph 11, your Honor.  "This plume has

19  migrated into the residential neighborhood to the north of GVP

20  property and continues to migrate."  That's Page 4, Lines 12

21  through 13.  Lines -- Paragraph 13, "Significant delays have

22  occurred in investigation and remediation of the contamination

23  at and emanating from the site."  And *the site* is Gregory

24  Village's site.

25      "Based on the extended timetable for plume

1    characterization" -- this is Paragraph 36, your Honor -- "for

2    plume characterization and data indicating contamination

3    released at the GVM had migrated into indoor air at the

4    Schaeffers' home, delays in investigation, contamination at and

5    emanating from the GVM extended the Schaeffers' exposure to

6    potentially carcinogenic chemicals in their home."

7        That certainly demonstrates that she did consider an

8    extensive number of documents as identified in her exhibits.

9        In addition, attached to Dr. Farr's is an extensive --

10              THE COURT:  Mr. Till, your time has expired.  Thank

11   you.

12              Mr. Goodman, welcome to the federal court.  Would you

13   come forward to the bar, please.

14              MR. GOODMAN:  Good afternoon, your Honor.

15              THE COURT:  Thanks for letting me trespass on your

16   hospitality and call you before the bar, even though you don't

17   have a motion pending.

18        Is it accurate that your client has settled with the

19   plaintiffs?

20              MR. GOODMAN:  It is accurate, your Honor.

21              THE COURT:  When will you file a motion for

22   determination of good faith settlement?  First of all, will such

23   a motion be necessary?

24              MR. GOODMAN:  It will.

25              THE COURT:  When will it be filed?

```
 1            MR. GOODMAN:  It will be filed within 10 days of the
 2   agreement being signed.  The draft is currently in plaintiffs'
 3   counsel's hands, it has been for a week, and we are waiting for
 4   a response.
 5            THE COURT:  Okay.  Thanks.  The motion is under
 6   submission.  Thank you.
 7            MR. GOODMAN:  Thank you, your Honor.
 8            (Proceedings adjourned at 3:42 p.m.)
 9
10
11                    CERTIFICATE OF REPORTER
12       I certify that the foregoing is a correct transcript
13   from the record of proceedings in the above-entitled matter.
14
15   DATE:   Wednesday, July 8
16
17
```

*Pamela A. Batalo*

```
19   _____
20   Pamela A. Batalo, CSR No. 3593, RMR, FCRR
21   U.S. Court Reporter
22
23
24
25
```